IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

OLAKITAN ADETAYO BANJOKO,
*also known as Banjoko Olakitan Adetayo*,

       Petitioner,

v.                                  2:26-cv-00016-MIS-JMR

PAM BONDI, *Attorney General*,
KRISTI NOEM, *Secretary of the
Department of Homeland Security*,
TODD LYONS, *U.S. ICE Field Officer
Director for the El Paso Field Office*, and
DORA CASTRO, *Warden of Otero County
Processing Center*,

       Respondents.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on *pro se*[1] Petitioner Olakitan Adetayo Banjoko's

Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241, filed on January 5, 2026. Doc. 1. I

have also reviewed Petitioner's additional filings including his medical records (Doc. 11),

proposed Amended Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. 9),

proposed Amended Memorandum of Law in support of the petition (Doc. 10), his Statement of

Fact (Doc. 14), and his two responses to the Federal Respondent's status report (Docs. 19, 20).

On January 29, 2026, the Federal Respondents filed a response to Dr. Banjoko's initial petition.

Doc. 7. The Federal Respondents also submitted supplemental briefing, as ordered by the Court.

---

[1] "A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Still, the Court may not "assume the role of advocate for the *pro se* litigant." *Id.*

Docs. 15, 18. The Warden Dora Castro has not appeared in this action.[2] United States District Judge Margaret I. Strickland referred this case to me pursuant 28 U.S.C. §§ 636(b)(1)(B) and (b)(3) to conduct hearings, if warranted, and to perform any legal analysis required to recommend to the Court an ultimate disposition. Doc. 13. Having considered the parties' submissions and the relevant law, I conclude that Petitioner is entitled to a bond hearing under § 1226. Therefore, I recommend that the Court GRANT IN PART and DENY IN PART the petition.

I.      **Background**

Dr. Banjoko is a Nigerian citizen. Doc. 1 at 11. He was admitted to the United States of America on September 17, 2019, as a nonimmigrant visitor for tourism (B-2 visa). Doc. 7-1 at 2 ¶ 5. His B-2 visa was set to expire on March 26, 2020. *Id.* Twenty-one days before his B-2 visa expired, the United States approved Dr. Banjoko for a religious visa (R-1 visa) to work as a minister with the Christ Apostolic Church of Tampa Bay. Doc. 1-1 at 10–12 (I-797A Notice of Action Form approving R-1 visa). His R-1 visa was set to expire on September 4, 2022. *Id.* Prior to its expiration, Dr. Banjoko applied for an adjustment of status. *See* Doc. 7-1 at 2 ¶ 8. He submitted Form I-360, a petition for special immigrants, including religious workers, to self-petition for an adjustment of status on March 11, 2022. *Id.* at ¶ 7. The government approved the petition on April 30, 2022. Doc. 18-1 at 2 ¶ 3. Then, on June 6, 2022, he submitted an I-485 form to adjust his status to a lawful permanent resident. *Id.* at ¶ 4. His adjustment of status application is still pending. *Id.*

---

[2] However, as the Federal Respondents note, "all arguments made on behalf of the remaining Respondents apply equally to Warden Castro." Doc. 7 at 1 n.1.

Because he had a valid visa at the time of applying to adjust his status, Dr. Banjoko is in a "period of stay authorized by the Attorney General." *See* 8 U.S.C. § 1182 (a)(9)(B)(ii). An alien[3] in a period of authorized stay does not accrue an "unlawful presence" in the United States. *Id.* But nonetheless, an alien in a period of authorized stay does not have a "lawful immigration status" without an independent basis for lawful status. *See* 7 POLICY MANUAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, pt. B, ch. 3, § D, https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-3 (further explaining the distinction between a period of authorized stay and lawful immigration status). As such, when Dr. Banjoko's religious worker visa expired, he no longer had lawful status in the United States.

On August 19, 2025, Dr. Banjoko was taken into Immigration and Customs Enforcement custody following a criminal arrest in the state of Florida. Doc. 7-1 at 2 ¶ 9. Dr. Banjoko maintains his innocence. *See* Doc. 1-1 at 11–12. After an investigation, the state prosecutor filed a notice of no information dropping the criminal charge. Doc. 1-1 at 2.

On September 3, 2025, the government issued a Notice to Appear as to Dr. Banjoko. Doc. 7-3. The Notice to Appear alleges that Dr. Banjoko "remained in the United States beyond March 26, 2020 without authorization from the Immigration and Naturalization Service or its successor the Department of Homeland Security." *Id.* at 1. This charge is not quite accurate. *See* Doc. 18-1 at 1 ¶ 1 (explaining that Dr. Banjoko had an R-1 visa that was valid until September 4, 2022). Nevertheless, Dr. Banjoko did not have a lawful immigration status at the time removal proceedings were initiated.

---

[3] The Court recognizes that some consider the term "alien" to be pejorative. However, the term "alien" is used in the relevant statutory framework. The Court uses this word to avoid legal imprecision or ambiguity that may be caused by using an alternative word.

While in removal proceedings, Dr. Banjoko allegedly "requested voluntary departure in lieu of a removal order and his request was granted." Doc. 7 at 5. As a condition of voluntary departure, the Immigration Judge "ordered Petitioner to provide travel documentation to DHS by December 27, 2025." Doc. 7 at 2. Dr. Banjoko, who remains in custody, did not do so.

Dr. Banjoko's "failure to provide travel documents within the time frame ordered resulted in a withdrawal of the voluntary departure grant and a[n] . . . immediately effective, order of removal to Nigeria." *Id.* at 3; *see also* 8 C.F.R. § 1240.26(d) ("Upon granting a request made for voluntary departure . . . the immigration judge shall also enter an alternate order o[f] removal.").

Initially, the Federal Respondents argued that Dr. Banjoko's removal order was already final because Dr. Banjoko waived his right to appeal. *See* 8 C.F.R. § 1241.1(b). But more recently, Respondents changed their position arguing that Dr. Banjoko's removal order is not final because he submitted an untimely appeal to the Board of Immigration Appeals ("BIA"). Doc. 18 at 2; *see also* 8 C.F.R. § 1241.1(a). The appeal remains pending. Doc. 18 at 2.

## II.     Inconsistent Sworn Statements and a Knowing Waiver of Rights

Before addressing the merits of Dr. Banjoko's petition, I have two concerns that merit attention even if they are not legally relevant to the petition. First, I am concerned about the inconsistent sworn declarations that the Federal Respondents submitted in support of their position. Second, I am concerned that Dr. Banjoko did not knowingly waive his rights when he agreed to voluntarily depart.

### A.  AFOD Ortez's Inconsistent Statements

First, I am concerned that Assistant Field Office Director ("AFOD") Jose P. Ortez has either recklessly prepared his declarations or has committed perjury. AFOD Ortez works for the Enforcement and Removal Operations of U.S. Immigration and Customs Enforcement. For

immigration-based § 2241 petitions in this district, the Federal Respondents often submit declarations from AFOD Ortez regarding an alien's immigration case status, removal proceedings, removal efforts, etc.

In this case, AFOD Ortez has submitted two sworn declarations relating to Dr. Banjoko. *See* Docs. 7-1, 18-1. In the first declaration, AFOD Ortez swore, under penalty of perjury, that Dr. Banjoko "did not seek or receive an extension for his stay," following the expiration of his B-2 tourist visa. Doc. 7-1 at 2 ¶¶ 5–7. The Federal Respondents submitted this declaration despite Dr. Banjoko attaching proof with his original petition that he received an R-1 visa before his B-2 visa expired. *See* Doc. 1-1 at 10–12 (I-797A Notice of Action Form approving R-1 visa). The Court then ordered the Federal Respondents to "provide context for this discrepancy." Doc. 15 at 1. Instead of doing so, the Federal Respondents provided a second declaration from AFOD Ortez. Doc. 18-1. In this second declaration, AFOD Ortez swears, under penalty of perjury again, that "[a]fter further reviewing additional DHS databases for Banjoko's Immigration record, I have been able to independently verify Banjoko did have a valid R-1 Visa for religious workers." *Id.* at 1 ¶ 1. Neither AFOD Ortez nor the Federal Respondents have acknowledged this inconsistency or the reasons behind it.

It is vital that the declarations submitted to this Court are accurate. For one reason, perjury is a felony offense. *See* 18 U.S.C. § 1621. It is in AFOD Ortez's own interest that his sworn declaration be accurate. Additionally, the Court does not have access to a petitioner's immigration record. Oftentimes, the AFOD's declaration is the only information the Court will receive regarding a petitioner's immigration case. Third, and most importantly, the petitioner's liberty interest is at stake. And in many cases, the petitioner's due process rights have, in fact,

been violated, and they are entitled to habeas relief. An inaccurate declaration could mislead the Court into unwittingly sanctioning the violation of a petitioner's rights.

While I have no reason to believe that AFOD Ortez has intentionally misled the Court, his diligence is required. But for this Court requiring additional briefing, it is unlikely this discrepancy would have ever come to light. While I do not recommend that the Court penalize AFOD Ortez at this time, I do urge AFOD Ortez, and the attorneys representing the Federal Respondents, to be more diligent in their representations to the Court going forward.

**B. Whether Dr. Banjoko knowingly and voluntarily waived his rights when he agreed to voluntarily depart.**

I am concerned that Dr. Banjoko may not have knowingly and voluntarily waived his rights when he agreed to voluntarily depart. However, the Respondents argue, and I agree, that the Court lacks jurisdiction to decide the matter. *See* Doc. 18 at 1; 8 U.S.C. § 1252(a). Instead, Dr. Banjoko must raise this argument with the Board of Immigration Appeals, and if unsuccessful, the relevant Court of Appeals. *See Arriaga-Alvarado v. Holder*, 483 F. App'x 520 (10th Cir. 2012) (Court of Appeals reviewing BIA's decision that Petitioner knowingly and voluntarily waived his right to appeal).

Dr. Banjoko alleges that he was "coerced" into "agreeing to a voluntary departure." Doc. 10 at 3. While I do not see evidence of conventional coercion, I am concerned that Dr. Banjoko did not knowingly waive his rights. Notably, when an alien agrees to voluntarily depart, they waive their rights to a removal hearing, appeal, and to apply for asylum. *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990); *Palacios-Yanez v. Holder*, 480 F. App'x 474, 477 (10th Cir. 2012).

Dr. Banjoko was allegedly told that failing to voluntarily depart would result in his indefinite detention without an opportunity for a bond hearing. Doc. 10 at 3. He claims that he

6

was "confused" and "intimidated" by the manner in which the Immigration Judge ran the hearing. Doc. 14 at 3. He reports that the Immigration Judge never mentioned his valid lawful immigration status. Doc. 1 at 12. The Immigration Judge was seemingly unaware of Dr. Banjoko's R-1 visa. He reports that ICE agents never answered "any of petitioner's question," nor did they "explain to petitioner the implication of signing" the voluntary departure form. *Id.*

The voluntary departure procedure has been called a "rough immigration equivalent of a guilty plea," allowing an alien to knowingly waive his right to a hearing in exchange for being able to depart voluntarily instead of under a deportation order. *Orantes-Hernandez*, 919 F.2d at 553 (citation omitted). "Although due process rights may be waived . . . such a waiver must be made knowingly and voluntarily." *Nose v. Att'y Gen. of U.S.*, 993 F.2d 75, 79 (5th Cir. 1993) (citations omitted). The alien must know that they are waiving their right to a removal hearing and the right to appeal. *Palacios-Yanez*, 480 F. App'x at 477; *Nose*, 993 F.2d at 78–79. Further, an alien "who indicated they feared persecution if returned home" must be "advised of the right to seek asylum." *See Orantes-Hernandez*, 919 F.2d at 556 (citation omitted).

I am concerned that Dr. Banjoko may not have "knowingly and voluntarily" signed his voluntary departure form. Most troublingly, Dr. Banjoko—a Christian minister—asserts that he cannot return to Nigeria because he fears torture and death at the hands of Boko Haram—an Islamist militant group based in Nigeria. *See, e.g.*, Doc. 1 at 13; Doc. 1-1 at 8; Doc. 14 at 6–7. Dr. Banjoko states that he has already been tortured in Nigeria based on his faith, as evidenced by his "disfigured fingers." Doc. 1 at 13. Dr. Banjoko has now been ordered removed to Nigeria, the very place where he fears persecution. Given these circumstances, I am concerned that Dr. Banjoko was not fully advised that signing the voluntary departure forms would waive his right to apply for asylum or withholding of removal to Nigeria. *See Orantes-Hernandez*, 919 F.2d at

556–57 ("[I[f INS officials were refusing to inform aliens of their right to seek asylum even if they did indicate that they feared persecution if returned to their home countries . . . [t]his would constitute a clear violation of the Refugee Act, and remedial action would be justified . . . .") (citation omitted). Additionally, Dr. Banjoko believes that he was lawfully living in the United States. *See, e.g.*, Doc. 1 at 17. If true, one would expect him to challenge his removability at a removal hearing, not concede that he is removable. Finally, Dr. Banjoko was charged with overstaying his B-2 visa. Dr. Banjoko has proof that he did not overstay his B-2 visa. He asserts that the Immigration Judge was not aware that he ever received an R-1 visa. Waiving the right to a removal hearing is an unusual choice for someone with such a ready defense.

That said, the Court admittedly has limited information. I do not have access to the immigration record or knowledge of Dr. Banjoko's discussions with his attorney. There may be other evidence in the record that shows that Dr. Banjoko's waiver of his rights was knowing and voluntary. But under these circumstances, I urge both the Board of Immigration Appeals and the Court of Appeals to take a close look at Dr. Banjoko's claim.

In sum, the district court lacks jurisdiction to review Dr. Banjoko's claim that he did not knowingly and voluntarily waive his rights when he agreed to voluntarily depart. Dr. Banjoko must, instead, argue this issue to the Board of Immigration Appeals. Then, if that appeal is unsuccessful, he may file a petition for review to the federal Court of Appeals for the judicial circuit in which his removal proceedings were held. *See* 8 U.S.C. § 1252(b)(2).

## III.    Legal Analysis

I recommend that the Court find that Dr. Banjoko is entitled to an individualized bond hearing at which the government bears the burden of proof. I further recommend that the Court deny Dr. Banjoko's other requests for relief.

**A.  Dr. Banjoko is entitled to a bond hearing under 8 U.S.C. § 1226.**

Dr. Banjoko requests that the Court "order the Respondents to release the petitioner immediately from ICE custody or conduct [an] immediate constitutional[ly] adequate individualized custody determination at which the government bears the burden of justifying his continued detention." Doc. 1 at 13. Because Dr. Banjoko's removal order is not final, I agree that he is entitled to an individualized bond hearing under § 1226.

The Federal Respondents argue that Dr. Banjoko is detained pursuant to 8 U.S.C. § 1231(a)(2)(A). Doc. 7 at 3. They are mistaken.

Section 1231(a)(2)(A) authorizes the detention "[d]uring the removal period." § 1231(a)(2)(A). "[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). This period of time is called the "removal period." *Id.* The removal period begins once the removal order "becomes administratively final," § 1231(a)(1)(B), meaning the order has been affirmed on appeal or the time to file an appeal has expired, 8 U.S.C. § 1101(a)(47)(B).

Here, Dr. Banjoko is not in the "removal period." *See Riley v. Bondi*, 606 U.S. 259, 300 (2025) ("The removal period does not begin, Congress has specified, until the removal order is "administratively final.") (citing § 1231(a)(1)(B)(i)). The Federal Respondents concede in their supplemental briefing that "[b]ecause there is a pending appeal, the removal order is not yet final." Doc. 18 at 2. Without an "administratively final" removal order, Dr. Banjoko cannot be held pursuant to § 1231(a)(1)(A). *See Horbenko v. Castro*, No. 2:25-CV-0764 WJ/DLM, 2026 WL 381867, at *7 (D.N.M. Feb. 11, 2026) ("Because Petitioner has no final order of removal . . . , the removal period has not begun, and § 1231(a) does not apply.").

9

The government has not provided any other statutory basis for detaining Dr. Banjoko. Nevertheless, I presume that Dr. Banjoko is detained pursuant to "'the default rule' for detaining noncitizens 'already present in the United States,'" which is 8 U.S.C. § 1226.[4] *Gonzalez Ramos v. Dedos*, No. 1:25-CV-00975-MLG-KRS, 2025 WL 3653928, at *3 (D.N.M. Dec. 17, 2025) (citing *Jennings v. Rodriguez*, 538 U.S. 281, 303 (2018)).

Section 1226, via its implementing regulations, requires that aliens receive an individualized bond hearing at the outset of detention. *Jennings*, 538 U.S. at 306 (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)). During such a bond hearing, the immigration judge must determine whether the alien is either a flight risk or a danger to the community. *Id.* at 303; *see also* § 1226(c)(4). "Although under normal circumstances, the burden at a § 1226 hearing is on the noncitizen to show that detention is unwarranted," once a noncitizen has been detained in violation of his constitutional rights that burden should shift to the government. *Pu Sacvin v. De Anda-Ybarra*, No. 2:25-CV-01031-KG-JFR, 2025 WL 3187432, at *3 (D.N.M. Nov. 14, 2025) (quotations omitted). In *Velasquez Salazar*, the Court provided a detailed rationale for why this burden shifting is an appropriate remedy under various Due Process Clause case law. *See Velasquez Salazar v. Dedos*, 806 F. Supp. 3d 1231, 1241–46 (D.N.M. 2025) (Urias, J.); *see also Lopez-Romero v. Lyons*, No. 2:25-CV-01113-MIS-JHR, 2026 WL 92873, at *6–7 (D.N.M. Jan. 13, 2026) (providing the same) (Strickland, J.).

Dr. Banjoko is entitled to a bond hearing under § 1226. Dr. Banjoko's continued detention without a bond hearing "constitutes an ongoing violation of [his] right to due process."

---

[4] Consistent with Judge Strickland's holding in *Lopez-Romero*, section 1225(b)(2)(A) cannot apply to Dr. Banjoko "because he is an alien already present in the United States, not an 'applicant for admission' or 'alien seeking admission' under Section 1225(b)(2)(A)." *See Lopez-Romero v. Lyons*, No. 2:25-CV-01113-MIS-JHR, 2026 WL 92873, at *4 (D.N.M. Jan. 13, 2026).

*Lopez-Romero*, 2026 WL 92873, at *6 (citations omitted). For the reasons set forth in *Velasquez Salazar* and *Lopez-Romero*, at the bond hearing the Government should bear the burden to prove by clear and convincing evidence that Petitioner poses a flight risk or danger to the community. Further, if the Government fails to meet its burden, bond should be set at an amount Petitioner can reasonably afford. If no bond hearing is held within seven days of an order adopting this Proposed Finding and Recommended Disposition, the Court should order Petitioner be immediately released from custody. Petitioner should not be re-detained without a pre-deprivation bond hearing before a neutral Immigration Judge pursuant to 8 U.S.C. § 1226(a). However, if a final order of removal is entered, Petitioner may be detained pursuant to § 1231(a)(2)(A).

**B. Dr. Banjoko is not entitled to any other relief.**

Dr. Banjoko's petition contains several other requests for relief. Dr. Banjoko requests that the Court approve his pending application to adjust his status to that of a lawful permanent resident. Doc. 1 at 9. He also requests that this Court "dismiss any deportation proceeding." Doc. 1 at 17. And he requests immediate release on the basis that he is being indefinitely detained. Doc. 1 at 7–8. However, this Court cannot grant relief on any of these bases.

This Court does not have authority to adjust Dr. Banjoko's legal status. *See* 8 U.S.C. § 1252(a)(2)(B)(i) ("[N]o court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1255 of this title."); § 1255(a) (Certain aliens' status "may be adjusted by the Attorney General . . . to that of an alien lawfully admitted for permanent residence. . . ."). Nor does it have authority to interfere with his removal proceedings. § 1252(b)(2) ("The petition for review [of a removal order] shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings.").

11

While this Court has authority to grant *Zadvydas* based relief, Dr. Banjoko is not yet eligible for such relief. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). Under § 1231 and *Zadvydas*, an alien may not be detained after a final order of removal without a "significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. However, *Zadvydas* relief is not available when an alien is being detained under § 1226—without a final order of removal. *C.f. Demore v. Kim*, 538 U.S. 510, 526–29 (2003). Detention while awaiting removal proceedings under § 1226 is not "potentially permanent" like detention under § 1231. *Id.* at 528.

If Dr. Banjoko's removal order becomes final, his detention would be governed by § 1231. Dr. Banjoko may then re-raise his *Zadvydas*-based claim at a later date if it appears that there is not a significant likelihood of removal in the reasonably foreseeable future. *But see Zadvydas*, 533 U.S. at 701 (holding that detention for 6-months after a final order of removal is presumptively reasonable).

For now, I recommend that the Court deny Dr. Banjoko's remaining requests for relief without prejudice.

## IV.    Recommendation

I recommend that the Court GRANT IN PART and DENY IN PART Petitioner Olakitan Adetayo Banjoko's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. 1). Because Dr. Banjoko's removal order is not final, I recommend that the Court order that:

- Respondents must hold a bond hearing for Petitioner within seven days of an order adopting this Proposed Findings and Recommended Disposition.

- At the bond hearing, the Government must prove by clear and convincing evidence that Petitioner poses a flight risk or a danger to the community.

- If the Government fails to meet its burden, bond shall be set at an amount Petitioner can reasonably afford.

- If no bond hearing is held within seven days of an order adopting this Proposed Findings and Recommended Disposition, Petitioner must be immediately released from custody and shall not be re-detained without a pre-deprivation bond hearing before a neutral Immigration Judge pursuant to 8 U.S.C. § 1226(a).

I recommend that the Court deny all of relief that Dr. Banjoko requested without prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma,* **73 F.3d 1057, 1060 (10th Cir. 1996). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court. In other words, if no objections are filed, no appellate review will be allowed.**

---

JENNIFER M. ROZZONI
United States Magistrate Judge

13